HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHARLES G. MOORE and KATHLEEN F. MOORE, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Civil Action No. 2:19-cv-01539 JCC <br><br> **DECLARATION OF CHARLES G. MOORE** |

Pursuant to 28 U.S.C. § 1746, I, Charles G. Moore, declare and state as follows:

1.      I am over the age of 18 years and am competent to make this declaration. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would competently testify thereto.

2.      I am married to Kathleen F. Moore, and we reside in King County, Washington.

3.      I spent much of my career working at Microsoft Corporation ("Microsoft") in Washington State as a software engineer.

4.      In 1991, I worked in Microsoft's applications development division where I met Ravindra Kumar Agrawal ("Ravi"). Ravi and I worked together on the Microsoft Word

---

DECLARATION OF CHARLES G. MOORE - 1
CASE NO.: 2:19-CV-01539 JCC

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA  98104-4040
Telephone:  (206) 332-1380

1  conversions team and then went on to work together on the Microsoft Office team. While working
2  together, we became friends.

3          5.      After one of Ravi's regular trips to India in the early 2000s, Ravi told me that he
4  noticed that many small and marginal farmers in India used very simple and basic hand tools, ones
5  that were far less efficient and effective than the tools available at Home Depot in the United
6  States. In addition, Ravi noticed that people from the rural parts of India were increasingly leaving
7  those areas and moving to cities, meaning there were fewer and fewer people available to perform
8  farming and agricultural work, which drove up wages and farmers' operating costs.

9          6.      Ravi shared with me his idea of starting a business to provide small and marginal
10 farmers with more efficient and cost-effective tools and machines that would increase their
11 productivity, help them better perform their jobs, and reduce their operating costs. Ravi's business
12 plan was motivated by his desire to help and serve small farmers and to establish a sustainable,
13 profitable business.

14         7.      Ravi assembled a business plan and formed an Indian Public Limited in 2005 called
15 KisanKraft Machine Tools Private Limited ("KisanKraft"). Later, the company's name was
16 changed to KisanKraft Limited.

17         8.      Ravi approached a number of friends, including me, about investing in KisanKraft
18 in 2005 and 2006. When Ravi first approached me, I gave his business plan and investment
19 proposal significant thought. We discussed the short-term, mid-term, and long-term goals of
20 KisanKraft and agreed that the best way for the business to succeed in its social and business
21 missions would be for it to reinvest any earnings, expand geographically, and, perhaps one day,
22 experience a public offering or sale. I thought the probability of that happening was low, but Ravi
23 had a good business plan and was someone whom I trusted. Moreover, I thought KisanKraft was
24 formed for a noble purpose and had the potential to improve the lives of small and marginal farmers
25 in India.

26

27

DECLARATION OF CHARLES G. MOORE - 2
CASE NO.:  2:19-CV-01539 JCC

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA  98104-4040
Telephone:  (206) 332-1380

9.    Kathleen and I invested in KisanKraft at its inception in 2006. At first, there were only a handful of shareholders, and Ravi, Sarika Agrawal (Ravi's wife), and Kathleen and I contributed 99.5 percent of the start-up capital. Kathleen and I invested $40,000, which was approximately 11 percent of KisanKraft's start-up capital. That was a lot of money for us, but we believed in Ravi's idea and wanted to support him and see it to fruition.

10.    Since KisanKraft's inception, Ravi has lived in India, where he manages KisanKraft's day-to-day operations. From 2006 to 2010, we spoke regularly, and he would give me updates on KisanKraft, including any new opportunities or developments such as a new tool or machine that he wanted to distribute. At the end of each year, Ravi would send me an annual financial statement for KisanKraft.

11.    Ravi asked Kathleen and me several times to come visit India. He wanted to show us around the country, and we wanted to see for ourselves how KisanKraft was doing.

12.    My first visit to India was in the fall of 2011. This visit was both a vacation and to see how KisanKraft was doing. While in India, Ravi took me to KisanKraft's main office, where I met a number of KisanKraft employees.

13.    During subsequent visits to India, I met other employees of KisanKraft and toured some of its branch offices and warehouses. I also met several dealers to which KisanKraft supplies its tools, as well as a few farmers who use its tools.

14.    I remember that one dealer in particular was very proud of the income he earned from selling KisanKraft's products, which permitted him to send his daughter to college to study electrical engineering.

15.    In total, I have visited India five times. My last trip was in 2016.

16.    To this day, Ravi regularly shares information with me about KisanKraft and its business. While Ravi shares information with me, he has served as the decision maker and CEO of KisanKraft since its inception.

DECLARATION OF CHARLES G. MOORE - 3
CASE NO.:  2:19-CV-01539 JCC

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA  98104-4040
Telephone:  (206) 332-1380

17.     Since its inception, KisanKraft has not made any distributions of earnings to its shareholders. Instead, it has retained its earnings to grow its business and serve more customers.

18.     Accordingly, I have never received a distribution, dividend, or other payment from KisanKraft.

19.     Because KisanKraft reinvested its earnings, it does not have sufficient cash on hand to distribute its retained earnings from over the years to shareholders.

20.     As a minority shareholder, I do not have the power to compel KisanKraft to make distributions to shareholders.

21.     Ravi remains to this day committed to KisanKraft's success. He spends a significant amount of time managing KisanKraft and remains focused on growing its business and serving small and marginal farmers.

22.     KisanKraft also has a corporate social responsibility policy. A true and correct copy of that policy is attached as Exhibit A. Carrying out that policy, KisanKraft seeks to improve the quality of life in communities in which it operates.

23.     Throughout 2017, Kathleen and I owned about 12.9 percent of KisanKraft's outstanding common shares.

24.     I first became aware of the Mandatory Repatriation Tax in the summer of 2018. Ravi mentioned the tax to me and put me in touch with a CPA who prepared his returns.

25.     The CPA told me about the Mandatory Repatriation Tax and how we were responsible for paying tax on KisanKraft's deferred foreign earnings going back to 2006. I was completely surprised. Having never received any income from KisanKraft, I certainly did not expect to have to pay income tax just because we owned shares in it.

26.     The CPA said that, based on statements prepared by KisanKraft, the Mandatory Repatriation Tax meant that we would be subject to taxation on our pro rata share of KisanKraft's retained earnings, which amounted to approximately $508,000.

DECLARATION OF CHARLES G. MOORE - 4
CASE NO.:  2:19-CV-01539 JCC

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA  98104-4040
Telephone:  (206) 332-1380

27.     After receiving a deduction associated with the Mandatory Repatriation Tax, the CPA told me that our taxable income increase from the Mandatory Repatriation Tax was $132,512.

28.     From the beginning, I had strong reservations about the Mandatory Repatriation Tax and thought that a new tax on earnings so far in the past that we hadn't even received couldn't possibly be constitutional. Nevertheless, I recognized the necessity of complying with my federal income tax obligations.

29.     Kathleen and I retained the CPA in the Summer of 2018 to help us become compliant with our filing obligations. The CPA prepared an amended U.S. federal income tax return for us, and we promptly filed it and paid our additional liability, which amounted to $14,729.

30.     We filed a second amended return in March 2019 claiming a refund of the additional amount we paid as a result of the Mandatory Repatriation Tax on the ground that it violated the Constitution's apportionment requirement and Due Process Clause.

31.     On August 30, 2019, the Internal Revenue Service mailed us a letter stating that our second amended return was referred to a second office. Other than that mailing, I did not receive any correspondence from the Internal Revenue Service regarding our second amended return.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this  26th  day of March, 2020 at King County, Washington.


_Charles G. Moore_
Charles G. Moore

DECLARATION OF CHARLES G. MOORE - 5
CASE NO.:  2:19-CV-01539 JCC

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA  98104-4040
Telephone:  (206) 332-1380

**EXHIBIT A**

**[KISANKRAFT CORPORATE SOCIAL RESPONSIBILITY POLICY]**

1

**KISANKRAFT LIMITED**

(Formerly known as KisanKraft Machine Tools Private Limited)

Corporate Identity Number (CIN): U29220KA2005PLC066051

Regd. Office: Sri Huchhanna Tower Site # 4, #748, 7th A Cross,

Maruthi Layout, Dasarahalli, Hebbal, Bangalore, Karnataka, India, 560024

Tel. No.: + 91 80 2217 8200, Fax: + 91 80 2233 1583

Email - info@kisankraft.com

Website: www.kisankraft.com

**CORPORATE SOCIAL RESPONSIBILITY POLICY**

**(CSR POLICY)**

**(Pursuant to Section 135 of the Companies Act, 2013)**

Adopted by the Board of Directors on 15th November, 2017

---

*Document Control Info :*

*Version No: 3*

*Approved By CSR Committee on :* 25th August, 2018

*Approved By Board on :* 25th August, 2018

*Last updated on :* 14th April, 2018

*Signed by :  Mr. Ravindra Kumar Agrawal, Managing Director*

---

For KisanKraft Limited

Authorized Signatory

# Table of Contents

1. Background: ................................................................................................................................ 3

2. Vision Statement: ...................................................................................................................... 3

3. CSR Programme Focus Areas: ................................................................................................. 3

4. CSR Budgets: ............................................................................................................................ 4

5. Implementation Process: .......................................................................................................... 4

6. Governance .............................................................................................................................. 5

7. Composition of CSR Committee: ............................................................................................ 6

8. Responsibility of CSR Committee: .......................................................................................... 6

9. Monitoring Mechanism ............................................................................................................ 6

10. Responsibility of Board of Directors' of the Company: ........................................................ 7

11. Validity of CSR Policy: .......................................................................................................... 7

## 1. Background:

Kisankraft Limited (hereinafter 'KKL') has developed this Policy titled the 'Kisankraft Limited – Corporate Social Responsibility Policy' (hereinafter 'CSR Policy') encompassing the Company for being a responsible corporate citizen and lays down the principles and mechanisms for undertaking various programmes in accordance with Section 135 of the Companies Act, 2013 ('the Act') for the community at large.

## 2. Vision Statement:

The vision of KKL is to contribute in some way to improve the quality of life in communities in which we live and work.

## 3. CSR Programme Focus Areas:

KisanKraft's CSR will primarily focus on programs that:

- Enhance employment, among farmers and rural labour including technicians, through training and various vocational skill developments such as operation and repair of agricultural machines and equipment through training centre
- Educate farmers and enhance their skills, by providing training relating to operation and repair of agricultural machines and equipment through training centre
- Create sustainable livelihood opportunities for farmers and rural labour
- Promote education relating to different modern and scientific agricultural practices
- Promotion of education including special education and employment enhancing vocational skills especially among children, women, elderly and the differently abled  and livelihood enhancement projects
- Eradicating hunger, poverty and malnutrition, promoting preventive health care and sanitation including contribution to the Swach Bharat Khosh set up by the Central government for the promotion of sanitation and making available safe drinking water including contribution to the Clean Ganga Fund set up by the Central Government for rejuvenation of river Ganga
- Setting up or supporting old age homes, day care centers and such other facilities for senior citizens
- Promoting gender equality, empowering women, transgender, setting up homes and hostels for women and orphans and measures for reducing inequalities faced by socially and economically backward groups
- Ensuring environmental sustainability, ecological balance, protection of flora and fauna, animal welfare, agro forestry, conservation of natural resources and maintaining quality of soil, air and water
- Protection of national heritage, art and culture including restoration of buildings and sites of historical importance and works of art; setting up public libraries; promotion and development of traditional arts and handicrafts
- Measures for the benefits of armed forces veterans, war widows and their dependents

- Training to promote rural sports, nationally recognized sports, Paralympic sports and Olympic sports;
- Contribution to the Prime Minister's National Relief Fund or any other fund set up by the Central Government or the State Government for socio-economic development and relief and funds for the welfare of the Scheduled Castes, the Scheduled Tribes, other backward classes, minorities and women and
- Contribution or funds provided to technology incubators located within academic institutions which are approved by the Central Government
- Rural development projects
- Slum area development.
- Promote and fund research, development, awareness of new technology and methods in all agriculture practices, including development of seeds, planting materials, machinery etc.
- Promote and fund research and development of education in any field
- Any other CSR activities as prescribed under the Companies Act, 2013 from time to time.

## 4.  CSR Budgets:

The total budget for the CSR projects will be decided by the CSR Committee as per the applicable provisions of the Companies Act, 2013

## 5.   Implementation Process:

a. KisanKraft will implement the chosen programs via **KISANKRAFT FOUNDATION**, a trust established by KisanKraft Limited. The Company will specify the CSR Programmes which may be undertaken by the Trusts in accordance with their Objects and administrative and accounting processes laid down in the respective Trust Deeds.

b. The CSR programmes will be undertaken by the Company on the basis of need assessment as done by the CSR committee and approved by the Board and preference will be given to local areas around which it operates.

c. The CSR activities can also be undertaken directly by the Company/ foundation or indirectly, through one or more registered trusts or societies or company with an established track record of three years in undertaking similar programs or projects.

d. If the CSR activities are done through outside implementing agencies the CSR committee will specify the projects and programs to be undertaken through these agencies, the modality of utilisation of funds and will specify reporting mechanism to ensure proper monitoring.

5

e.  The Company may also collaborate with other entities for undertaking CSR activities, projects or programmes.

f.  The CSR committee may if need arises formulate special team to help it regulate, manage and monitor various activities. The team will have 2 or more members as deemed fit by the committee, the key responsibilities, role and reporting mechanism of the team shall be clearly defined by the CSR committee.

g.  The CSR activities, projects or programs will be undertaken in India only.

h.  The CSR funds shall not be given directly or indirectly to any political party.

i.  Any surplus arising out of CSR activities, projects or programmes shall not form part of business profit of the Company.

## 6.  Governance

a.  Every year, the CSR Committee will place for the Board's approval, a CSR Plan delineating the CSR Programmes to be carried out during the financial year and the specified budgets thereof. The Board will consider and approve the CSR Plan with or without any modification that may be deemed necessary.

b.  The CSR committee will assign the task of implementation of the CSR Plan within specified budgets and timeframes to such persons or bodies or entities as it may deem fit.

c.  The persons/bodies/entities to which the implementation is assigned will carry out such CSR Programmes as determined by the CSR committee within the specified budgets and timeframes and report back to the CSR committee on the progress thereon at such frequency as the CSR committee may direct.

d.  The CSR committee shall review the implementation of the CSR Programmes on a regular basis and issue necessary directions from time to time to ensure orderly and efficient execution of the CSR Programmes in accordance with this Policy.

e.  Every quarter, the CSR committee will provide a status update to the Board on the progress of implementation of the approved CSR Programmes carried out during the period. It shall be the responsibility of the CSR Committee to keep the Board apprised of the status of implementation of the same.

f.  At the end of every financial year, the CSR Committee will submit its detailed report to the Board.

## 7.  Composition of CSR Committee:

The composition of CSR committee of the Board is as follows:

| Sl. No. | Name of the Member | Designation | Category |
|---|---|---|---|
| 1 | Mrs. Sarika Agrawal | Chairperson | Whole Time Director |
| 2 | Mr.  Ravindra Kumar Agrawal | Member | Managing Director |
| 3 | Mr. Ramkumar Krishnamachari | Member | Independent director |

## 8.  Responsibility of CSR Committee:

a. Formulate and recommend CSR Policy to Board for approval
b. Monitor the policy from time to time and recommend changes to the Board
c. Recommend CSR activities, projects or programmes which are in line with the activities specified in Schedule VII, to be undertaken by the Company.
d. Recommend the amount of expenditure to be incurred on CSR activities, projects or programmes to be undertaken by the Company.
e. Constitute a transparent monitoring mechanism for ensuring implementation of CSR activities, projects or programmes to be undertaken by the Company.
f. Constitute CSR team consisting of requisite number of persons appropriate to undertake its CSR activities, projects or programmes on an on-going basis.
g. Review quarterly reporting made by CSR team for each activities, projects or programmes undertaken by the Company from time to time.

## 9.  Monitoring Mechanism

a. Each of the CSR projects and programmes would have clearly defined objective, output/ outcome and process indicators.
b. Reporting with respect to each project or program will have to be done at specified frequencies not less than once in a quarter i.e The CSR Committee will receive quarterly progress reports of all CSR activities, projects or programmes of the company.
c. All projects and programmes may be monitored by the CSR Committee itself or through the special team formed for the purpose. The monitoring process will cover both programmes and financial reviews.
d. The special team formed by the committee may ensure the satisfactory implementation of projects/programmes undertaken through onsite visit and surveys in the specified areas or any other means as may be deemed fit.
e. All projects and programmes will be subjected to an annual financial audit by a third-party auditor.

## 10. Responsibility of Board of Directors' of the Company:

    a. Approval of CSR policy of the Company after taking into account the recommendations made by CSR Committee

    b. Disclosing the content of the Policy in its report and placing the Policy on the Company's website in such manner as prescribed under Section 135 of the Act read with the Companies (Corporate Social Responsibility Policy) Rules, 2014.('CSR Rules')

    c. Ensuring that the activities as are included in the Policy are undertaken by the Company

    d. Ensuring that the Company endeavours to spend the amount as decided by the CSR committee as per the applicable provisions of the Companies Act, 2013

    e. Ensuring that the board's report includes an annual report on CSR containing the particulars as per the annexure provided in Companies (Corporate Social Responsibility) Rules, 2014.

    f. Ensuring that it specifies the reasons in its report for not spending the allocated amount in case the Company fails to spend such amount

## 11. Validity of CSR Policy:

The Board shall review the CSR policy once a year or more and may amend as may be required.

\*\*\*\*\*\*

**For KisanKraft Limited**

**Authorized Signatory**