1

Honorable John C. Coughenour

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
7                              AT SEATTLE

8    CHARLES G. MOORE AND KATHLEEN F.     )
     MOORE,                               )    Case No. 2:19-cv-01539-JCC
9                                         )
               Plaintiffs,                )    **UNITED STATES' REPLY IN**
10                                        )    **SUPPORT OF MOTION TO DISMISS**
               v.                         )    **AND RESPONSE TO MOORES'**
11                                        )    **CROSS-MOTION FOR SUMMARY**
     UNITED STATES OF AMERICA,            )    **JUDGMENT**
12                                        )
               Defendant.                 )    ORAL ARGUMENT REQUESTED
13   _____)

14          The United States of America hereby files this combined reply in support of its Motion to

15   Dismiss (Dkt. No. 26) and response to Plaintiffs' Cross-Motion for Summary Judgment (Dkt.

16   No. 29).

17

18   //

19

20   //

21

22   //

23

24

U.S. Reply re: Mot. to Dismiss and          i
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.   Section 965 is constitutional: It defines what is included in income. ................................. 2

   A.   Corporate form is respected until it's not: The Constitution permits taxing shareholders on undistributed earnings of corporations to prevent abuse. ................................. 3

   B.   Subpart F at its core looks through the corporation and attributes corporate income to U.S. shareholders, including minority shareholders. ................................. 5

   C.   Subpart F income and inclusions are based on a CFC's earnings. Section 965 does not change that. ................................. 7

   D.   Subpart F does not require a *Macomber*-like "inclusion event." ................................. 8

   E.   *Macomber*'s reach is limited to its facts—whether stock splits are income within the meaning of the Sixteenth Amendment. ................................. 8

   F.   Subpart F provisions are continually upheld as constitutional. The Moores point to no case that dictates a different result for § 965. ................................. 11

      1.   *Applying Eder, § 965 is constitutional.* ................................. 12

      2.   *Whitlock supports upholding § 965.* ................................. 13

      3.   *In Garlock, the Second Circuit rejected a similar constitutional challenge to subpart F as "bordering on the frivolous."* ................................. 14

      4.   *The Tax Court has consistently found the subpart F provisions implicated by § 965 to be constitutional.* ................................. 15

II.   Section 965 is not retroactive, despite the Moores' attempts to make it so. ................................. 16

   A.   The Moores adopt an overly broad definition of retroactivity. ................................. 16

   B.   The Moores misconstrue the plain language of § 965. ................................. 19

   C.   The Moores fail to distinguish adverse case law. ................................. 21

III.   Section 965 passes the *Carlton* test. ................................. 24

   A.   The Moores rely on century-old cases that are inapplicable. ................................. 24

      1.   *Section 965 is not a "wholly new tax."* ................................. 24

      2.   *The Supreme Court questions whether the Moores' cited cases are good law.* ..... 27

   B.   There is no bright-line limit on retroactivity under *Carlton*. ................................. 27

   C.   The Moores substitute a non-binding, Federal Circuit standard for the Supreme Court's *Carlton* standard. ................................. 29

   D.   Section 965 is still constitutional under the Moores' Federal Circuit standard. ........... 30

   E.   It is irrelevant that the Moores are minority shareholders. ................................. 32

IV.   Even if the court finds § 965 unconstitutional, the Moores have failed to prove they are entitled to a refund. ................................. 34

CONCLUSION ................................................................................................................. 34

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

ii

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

# INTRODUCTION

Section 965 safeguards the public fisc from what would otherwise be a multibillion-dollar windfall created by the TCJA. Section 965 is a transitional income inclusion that ensures tax-deferred income under the pre-TCJA system is taxed under the TCJA. The Moores focus myopically on the tax bill they got in 2017, ignoring the underlying logic and fairness of § 965,[1] and the fact that their present tax bill stems from a beneficial tax deferral they had enjoyed for over a decade.

Because subsequent developments in case law do not support their position, the Moores resort to outdated law to attack § 965. Their direct-tax challenge asks, ultimately, whether a corporation's accumulated earnings can constitutionally be taxed to the shareholders of that corporation absent a distribution. That question has been asked and answered with a resounding yes with respect to many parts of the tax code. Notwithstanding this precedent, the Moores insist that *Eisner v. Macomber*, 252 U.S. 189 (1920)—a century-old case whose holding has been eroded—should be applied to impose a distribution requirement before income can be taxed.

Likewise, the Moores reach back to 1920s case law—from which the Supreme Court has distanced itself—to classify § 965 as a retroactive "wholly new tax." But § 965 operates within the subpart F and income tax frameworks, both of which have existed for decades. The Moores misconstrue prior tax deferral as entitling them to never pay tax. Their arguments are further premised on a faulty standard that § 965 is retroactive if it makes them "worse off." It is unclear whether the Moores are, in fact, "worse off" under § 965. And the Moores overlook the text of § 965 and a host of case law allowing statutes to measure income with reference to past conduct. All of these authorities show § 965 is not retroactive.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.).

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

1

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

Whether the issue is direct tax or retroactivity, it is simply irrelevant that the Moores are minority shareholders. The law, as Congress wrote it, does not require majority control to subject United States shareholders (as defined in 26 U.S.C. § 951(b)) to tax on the undistributed earnings of a controlled foreign corporation (CFC) (as defined in 26 U.S.C. § 957(a)). Section 965 treats minority shareholders consistently with longstanding law on CFCs under subpart F of the tax code, which was adopted to prevent abuses through CFCs. The Moores present no basis for upending subpart F or fashioning a carve-out for minority shareholders where Congress did not intend one. The court should grant the United States' Motion to Dismiss and deny the Moores' Cross-Motion for Summary Judgment.

## ARGUMENT

### I.   Section 965 is constitutional: It defines what is included in income.

The Moores wrongly assert that § 965 is unconstitutional because it is a "direct" tax, and as such, must be apportioned among the states. They misconstrue both § 965 and the concept of direct tax. *See* U.S. Mot. to Dismiss ("MTD") at 12-19 (prior discussion). The bulk of their argument revolves around application of *Eisner v Macomber*'s "realization" or "inclusion event"[2] requirement to subpart F, and in particular to § 965. But the underlying premise of *Macomber*—that a stock split is not income—is not a useful comparison. *Macomber*'s impact has eroded in the century since it was issued, limiting its holding to its facts. And *Macomber* was focused on the question of whether a taxpayer had income in the first place. As such, it has little relevance to the questions of when, and to whom, income should be recognized. In the

---

[2] The phrase "inclusion event" is used here to refer to the *Macomber*-like "realization" (or "taxable event") requirement that the Moores advocate: namely, that some kind of distribution event is needed to "trigger" income tax. *See* Opp. at 14-21. The *Macomber*-like "inclusion event" is a separate concept from realization as an administrative function in tax law, which means simply that the taxpayer has accrued or earned income. *Infra* Sec. I.E. The § 965 income inclusion has been realized by taxpayers in the latter, more accurate sense.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

2

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

intervening years, U.S. tax law has changed—both in terms of *who* is subject to tax (the corporation or the individual) and also *when* they are subject to tax. These changes mean *Macomber* has, at best, questionable relevance to the issues before the court.

Similar to other areas of tax law, provisions in subpart F of the Internal Revenue Code (relating to CFCs) *intentionally* shift the tax burden on income earned by an entity to owners of the entity, in spite of form. The measure of tax is not on an ownership interest, but instead, on a taxpayer's share of undistributed earnings—inherently income of the corporation. Section 965 is one of several provisions that define what is included in a taxpayer's income under subpart F. Like many tax laws, § 965 (through § 951) provides that certain undistributed earnings—income that is attributable to, but not distributed to, taxpayers—are included in income. Courts have consistently upheld such laws as constitutional under the Sixteenth Amendment. To rule contrary to this established line of cases and allow taxpayers to repatriate this income tax-free would not be a "just" result. As such, the Moores' Apportionment Clause challenge should be denied.

### A. Corporate form is respected until it's not: The Constitution permits taxing shareholders on undistributed earnings of corporations to prevent abuse.

A longstanding concept in U.S. taxation is that income to a corporation is not income to a shareholder. *Eisner v. Macomber*, 252 U.S. 189, 213–14 (1920). But the counterpart to that general concept is that the corporate form will be disregarded where it is "deemed necessary to achieve a just result." *Id.* at 231–32 & n.5 (Brandeis, J., dissenting); *see also Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 288–89 & n.4 (1938). Throughout our tax history, Congress and the courts have combated abuses by taxpayers using corporations to evade or avoid tax. *See Ivan Allen Co. v. United States*, 422 U.S. 617, 624–25 (1975); *United States v. Donruss Co.*, 393 U.S. 297, 303–07 (1969) (outlining legislative history of domestic anti-deferral provisions). In the intervening years since *Eisner v. Macomber*, Congress and the courts have repeatedly overlooked

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

3

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1    the corporate form and imposed tax directly on shareholders. And contrary to the Moores'

2    assertions, tax is imposed in these situations regardless of what was distributed to shareholders—

3    or more importantly, in spite of there being *no distributions to shareholders*.

4         These provisions have targeted domestic abuses by imputing undistributed corporate

5    profits directly to shareholders. *See National Grocery*, 304 U.S. at 288–89 & n.4 (noting various

6    statutory provisions imputing domestic and foreign corporate income to shareholders); 26 U.S.C.

7    §§ 951-964 (CFC rules of subpart F), §§ 1291-1297 (passive foreign investment company rules),

8    and §§ 551-558 (since repealed foreign personal holding company rules). And where taxpayers

9    have abused the corporate form to evade tax, courts have developed judicial doctrines that look

10   to the substance of a transaction, rather than its form, and that disallow tax benefits based on

11   sham characterizations.

12        Even before subpart F (and § 965), the Supreme Court was not opposed to looking

13   through the corporate form to impose tax directly on a shareholder. In *National Grocery*, the

14   Supreme Court recognized that until 1921, excess gains and profits had been taxed to the

15   shareholder despite no distribution and despite lack of control. 304 U.S. at 288–89 & n.4.

16   Though the issue in *National Grocery* was whether a surtax on the corporation for excessive

17   undistributed earnings was a tax on income, the Court explained in dicta that Congress could

18   have imposed the tax directly on the shareholder, regardless of whether a distribution occurred.

19   *Id.* (noting the variety of ways in which imposition of tax looks through the corporate form to the

20   taxpayer). The Court accepted that such a tax was constitutional and dismissed the notion that it

21   would be anything besides an income tax under the Sixteenth Amendment. *Id.* at 288–89.

22   Notably, the Court made no mention of *Macomber* when suggesting Congress could tax

23   shareholders directly on corporate profits. Instead, it stated that a tax on previously accumulated,

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

4

undistributed earnings is "laid upon the net income of such corporation" and is a "true income tax within the meaning of the Sixteenth Amendment." *Id.* at 289–90. A few years later, in a case where factual distinctions rendered it unable to revisit *Macomber*, the Supreme Court recognized that *Macomber* may have been an instance where it fell "into error as may other branches of Government." *Helvering v. Griffiths*, 318 U.S. 371, 400–01 (1943). But due to limits on "its ability to extricate itself from error . . . [in the absence of] a case or controversy," the Court declined to revisit *Macomber*'s holding. *Id.*

### B. Subpart F at its core looks through the corporation and attributes corporate income to U.S. shareholders, including minority shareholders.

There is nothing unfair about applying § 965 to minority shareholders. The possibility that income could be attributed to a U.S. shareholder[3]—even if the shareholder lacked the ability to determine whether the income was distributed to them—has been around for decades. This is an inherent risk of being a minority shareholder of a CFC—a risk the Moores assumed when they invested as minority owners of KisanKraft. Section 965 did nothing to alter that risk.

Subpart F combats taxpayer abuses through CFCs and allows the IRS to look through the corporate form and tax U.S. shareholders directly. For certain categories of foreign income, subpart F treats income earned by a CFC as income earned by its U.S. shareholders. These rules apply whether the U.S. shareholder has a majority or minority ownership interest in the CFC, assuming the threshold 10% ownership requirement is met. *See* 26 U.S.C. § 951(b) (U.S. shareholder must have at least 10% interest in CFC); 26 U.S.C. § 957 (*combined* ownership of

---

[3] Like in the Motion to Dismiss, "U.S. shareholder" refers to a United States shareholder as defined in § 951(b)—in other words, a U.S. person owning 10% or more of a CFC by vote. MTD at 6 n.3; 26 U.S.C. § 951(b) (pre-TCJA).

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

5

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

all U.S. shareholders must be greater than 50% by vote or value).[4] And U.S. shareholders are taxed on the CFC's subpart F income regardless of whether it was distributed to them. 26 U.S.C. § 951(a); *SIH Partners LLLP v. Comm'r*, 923 F.3d 296, 301, 307–08 (3d Cir. 2019) (taxpayer had to include in income $1.5 billion loan to affiliate because 2 CFCs were among the over 30 affiliates that had guaranteed the loan), *cert. denied*, 140 S. Ct. 854 (2020). In other words, subpart F operates as a deemed recognition event for U.S. shareholders.

Even though minority shareholders may lack the ability to control distributions, they are still fairly and rationally included within subpart F. "It not infrequently happens that legislative bodies, with specific instances of abuse in mind, phrase tax legislation in such broad terms as to include persons or groups of persons not specifically contemplated. The alternative is over-particularization, which may lend itself to evasion by clever changes of form or method." *Am. Package Corp. v. Comm'r*, 125 F.2d 413, 416 (4th Cir. 1942) (personal holding company surtax where shareholders in aggregate owned more than 50%, but individual shareholders did not).

The "control" element in subpart F stems from the definition of a CFC—which is that U.S. shareholders in the aggregate have control, not that an individual shareholder necessarily has control. Subpart F, as it has existed for nearly 60 years, is explicitly written by Congress to impute income to U.S. shareholders owning at least 10% of a CFC. *See* 26 U.S.C. §§ 951(a)-(b), 957; *Dougherty v. Comm'r,* 60 T.C. 917, 928 n.13 (1973). Nothing in subpart F requires an individual U.S. shareholder to have a majority interest in a CFC for the income attribution rules to apply. These definitions have existed since enactment and have not been challenged.

---

[4] As set forth in the Motion to Dismiss, the TCJA changed the definition of "United States shareholder" to include 10% ownership by value (instead of only by vote), but that has no bearing on this case. MTD at 6 n.3.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

6

1   The foreign personal holding company provisions enacted in 1938 are similar to subpart

2   F and have also been repeatedly upheld. In *Mariani Frozen Foods, Inc. v. Commissioner*, 81 T.C.

3   448, 468–71 (1983), *aff'd sub nom. Gee Trust v. Comm'r*, 761 F.2d 1410 (9th Cir. 1985), the

4   taxpayer tried to defeat tax by claiming minority ownership in a foreign corporation, but the Tax

5   Court held the statute applied where all U.S. shareholders *combined* held more than 50% value.

6   The court went on to note that "we must apply the law as it is written, not as [taxpayers] believe

7   it should have been written." *Id.* at 468. "Whatever evil Congress sought to prevent by passing

8   the foreign personal holding company provisions, it chose to achieve its ends by erecting an

9   unambiguous mechanical test for determining when a foreign corporation is a foreign personal

10   holding company." *Id.* That test is nearly identical to the CFC test discussed above, which

11   likewise applies unambiguously to minority shareholders of CFCs.

12   While the Moores make much of their status as minority shareholders, Congress intended

13   them to be included in subpart F. Section 965 is no different in that respect. As such, the Moores'

14   grievance is a predicament of their own making.

### C.  Subpart F income and inclusions are based on a CFC's earnings. Section 965 does not change that.

16   Section 965 measures income based on a CFC's accumulated earnings and profits. *See*

17   *generally* 26 U.S.C. § 965. The Moores suggest they are being taxed on their ownership of a

18   CFC, but § 965 itself explicitly states the contrary. Income is attributed to a U.S. shareholder not

19   based on their shares held, but rather, on their pro rata share of the CFC's income. 26 U.S.C.

20   § 965(a)(1), (a)(2). Further, the portion of CFC income imputed to a U.S. shareholder under

21   § 965 is determined in a manner similar to that used to determine subpart F income generally. 26

22   U.S.C. § 965(f). Subpart F and its income inclusion rules have existed and survived

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

7

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

constitutional challenges long before the Moores invested in KisanKraft. Section 965 works

within subpart F's overall inclusion rules. As such, § 965 is directed at income, not ownership.

### D.  Subpart F does not require a *Macomber*-like "inclusion event."

The Moores would like the court to believe that the outcome here is controlled by *Eisner*

*v. Macomber*, in which the Supreme Court ruled that "stock dividends"—in essence, stock

splits—were not taxable income because the gain was not "severed" from the underlying capital.

252 U.S. at 207–08, 211–12. Not only has *Macomber*'s holding been eroded in subsequent years,

*supra* Sec. I.A, no such inclusion event or "severing" need occur for CFC income to be attributed

to a U.S. shareholder under subpart F. While the Moores make much of a "triggering event" as

the impetus for a § 956 inclusion, no "event" is required. The statute's plain language requires

only an "amount . . . held" in U.S. property—and this can be a holding acquired in a prior tax

year. 26 U.S.C. § 956(a)(1)(A). Further, a § 956 inclusion does not require current income.

*Dougherty*, 60 T.C. at 928, 937–38. Section 965 merely operates within this subpart F

framework. As explained below, a multitude of court decisions reflect a backing away, and while

not expressly acknowledging it, an implicit recognition that *Macomber* has little bearing on

subpart F. *See, e.g.*, *Dougherty*, 60 T.C. at 929–30; *infra* Secs. I.E, I.F (later Supreme Court

decisions clarifying *Macomber*'s reach, lower courts decisions upholding subpart F and similar

provisions).

### E.  *Macomber*'s reach is limited to its facts—whether stock splits are income within the meaning of the Sixteenth Amendment.

The Moores attempt to distract the court from the underlying import of legal authorities

undercutting *Macomber*. They can point to nothing showing *Macomber*'s narrow definition of

income is relevant to subpart F. Subsequent case law and legislation looking through the

corporate form and imposing tax on individual shareholders (even minority shareholders), along

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

8

with intervening jurisprudence, have rendered *Macomber* limited to its facts. "Severability" of income quickly ceased being a constitutional requirement after *Macomber*. *Helvering v. Bruun*, 309 U.S. 461, 468–69 (1940) (upholding constitutionality of taxing lessor on the increased value of its land following improvements by lessee, notwithstanding taxpayer's inability to "sever" the gain from his capital investment). And since *Macomber*, no judicial decision (to the government's knowledge) has declared a federal tax unconstitutional under the Sixteenth Amendment on the theory that income had not been "severed" from the asset—a common, albeit mistaken, understanding as to *Macomber*'s significance. *Supra* Sec. I.A.

The *Macomber* decision itself was controversial, issued after two oral arguments and a five-to-four vote. 252 U.S. at 201, 219–20, 238. While it has not been expressly overturned, the validity of its holding—that a strict inclusion event is constitutionally required absent apportionment—is questionable. Twenty years after deciding *Macomber*, the Supreme Court rejected *Macomber*'s strict definition of income and limited its application to its facts—that "stock dividends" (essentially stock splits) that do not alter the stockholder's relative interest in a corporation are not income under the Sixteenth Amendment. *Bruun*, 309 U.S. at 468–69.

And the Supreme Court has, at least implicitly, recognized that *Macomber* should be overruled because it hinders Congress's ability to address the longstanding problem of taxpayers abusing the corporate form. In *National Grocery*, the Court set forth a variety of provisions where the corporate form is overlooked and income is attributed directly to the shareholder. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 288–89 & n.4 (1938). There, the Court went so far as to suggest that if it chose to do so, Congress could look through the corporate fiction and impose tax directly on the shareholder. *Id.* at 288–89. In *Griffiths*, the Court noted that Congress's first attempt at stopping abuse of the corporate form imposed tax for excessive

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

9

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

retained earnings directly on the shareholder. *Helvering v. Griffiths*, 318 U.S. 371, 376–77 (1943). But after *Macomber*, Congress reconsidered that approach and settled on a surtax on corporations. *Id.* at 376–77, 385–86. The Court in *Griffiths* set forth the Congressional debate on *Macomber*'s impact and recognized the erosion of its applicability, but could not overrule *Macomber* because the plaintiff in *Griffiths* lacked standing to challenge the constitutionality of the taxing provision at issue. *See id.* at 376–87.

Courts and commentators have questioned and generally dismissed the notion that a *Macomber*-like "realization" requirement—or more accurately speaking, a distribution requirement[5]—is implicit in the Sixteenth Amendment's definition of income. In 1964, the Ninth Circuit explained *Macomber*'s then-limited value in defining income:

> Essentially, the *Eisner v. Macomber* statement is a generalization rather than a definition. The Supreme Court has recognized the futility of attempting to capture the concept of income and confine it within a phrase. In *United States v. Kirby Lumber Co*. the Court explicitly abandoned the search for a definition, and succeeding cases have not revived the search. The courts have given a wide scope to the income tax, but have realized that the borderline content of "income" must be determined case by case. Essentially the concept of income is a flexible one, with the result in a particular case being determined by the interplay of common usage, accounting concepts, administrative goals, and finally judicial reaction to these forces.

*United States v. James*, 333 F.2d 748, 753 (9th Cir. 1964). And since then, the Supreme Court has viewed the concept of realization more as a matter of administrative convenience and fairness, rather than as a constitutional requirement under *Macomber*. *See Cottage Savings Ass'n v. Comm'r*, 499 U.S. 554, 559 (1991); *see also* Jeffrey L. Kwall, When Should Asset Appreciation Be Taxed?: The Case for a Disposition Standard of Realization, 86 Ind. L.J. 77, 79–88 (2011) ("The view that realization is constitutionally mandated has dissipated during the

---

[5] As explained, the *Macomber* idea of "realization" hinges on distribution or "severing," and differs from the modern-day concept of realization under the tax code. *Supra* note 2.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

10

past three-quarters of a century."); Marvin A. Chirelstein, Federal Income Taxation 73 (11th ed. 2009) ("[R]ealization is strictly an administrative rule and not a constitutional, much less an economic requirement, of 'income.'"); Noel B. Cunningham & Deborah H. Schenk, Taxation Without Realization: A "Revolutionary" Approach to Ownership, 47 Tax L. Rev. 725, 741, 741 n.69 (1992) (citing "[t]he scholarly consensus"); Charles L.B. Lowndes, Current Conceptions of Taxable Income, 25 Ohio St. L.J. 151, 176 (1964) ("[I]t appears that as a constitutional prerequisite realization is no longer required.").

Courts have also upheld taxes on undistributed income as applied to partners and S corporation shareholders, despite the lack of an "inclusion event" under *Macomber*. MTD at 14-15 (citing statutes and case law). The income attribution occurs even if an individual partner or S corporation shareholder lacks the control necessary to force a distribution. *Id.*

In short, the issue before the court is not an income tax on a share of a corporation—the narrow issue on which *Macomber* still governs. When it comes to income generally, and disregarding the corporate form to tax undistributed income, Congress and the courts have rejected a strict application of *Macomber* and its "severability" requirement.

### F.  Subpart F provisions are continually upheld as constitutional. The Moores point to no case that dictates a different result for § 965.

In each of the inaptly described "hodge-podge" (Opp. at 18) of cases addressing subpart F or its predecessor, *see* MTD at 12-14, courts upheld the constitutionality of looking through a foreign corporation and imposing tax on its U.S. shareholders. No fact pattern is identical to the Moores'—nor could one be—because theirs is the first case challenging the substance of newly-enacted § 965. Regardless, no case supports the result the Moores want—to indefinitely defer tax on earnings from their investment. As explained, the constitutionality of subpart F and its analogous predecessor provisions has been upheld in numerous cases. *See also* MTD at 12-14.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

11

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

### 1.  Applying Eder, § 965 is constitutional.

*Eder* considered a situation factually the most similar to § 965's application to the Moores. There, the Second Circuit held that imputing corporate income to minority shareholders was constitutional, despite no distribution of that income to shareholders. *Eder v. Comm'r*, 138 F.2d 27 (2d Cir. 1943). The taxpayers in *Eder* were, like the Moores, minority shareholders of a foreign corporation. *Id.* at 27. They, like the Moores, were subject to tax on the undistributed earnings of a foreign company even though they were unable to force a distribution. *Id.* at 27–28 (involving provisions analogous to subpart F and § 951). The taxpayers in *Eder* made similar arguments as the Moores, but the Second Circuit rejected those arguments and upheld the tax on undistributed income as constitutional. *Id.* at 28–29. Given *Macomber*'s prevalence in decisions of that era, it could not have been far from the court's thinking. Yet *Macomber* was not followed, as *Eder* required no "inclusion event." Indeed the court in *Eder* cited *Bruun*, 309 U.S. 461, which had distinguished *Macomber*. *Eder*, 138 F.2d at 28. Given the factual and legal parallels between *Eder* and § 965, the Moores' attempt to dismiss *Eder* as "unpersuasive" is unfounded. *See* Opp. to Mot. to Dismiss & Cross-Mot. for Summ. J. (Dkt. No. 29) ("Opp.") at 18.

Notably, years later, the Treasury Secretary opined on whether the lack of an inclusion event affected the constitutionality of proposed legislation that would impose capital gains tax on transfers other than sales. The Secretary pointed out that the provision at issue in *Eder*, which was found to be constitutional, was essentially imposing tax in the absence of an "inclusion event." Hearings on President's 1963 Tax Message before House Committee on Ways and Means, 88th Cong., 1st Sess., part 1, at 594 (1963) (attached).

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

12

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1

### 2.   *Whitlock* supports upholding § 965.

2    Contrary to the Moores' assertion, *Whitlock* provides ample ground to uphold § 965, and

3    in particular, to impute corporate earnings to shareholders in the absence of a *Macomber*-like

4    "inclusion event." In *Whitlock*, taxpayers challenged the constitutionality of a tax on the

5    undistributed earnings of a foreign corporation in which they held stock. *Estate of Whitlock v.*

6    *Comm'r¸* 59 T.C. 490, 509 (1972), *aff'd in part, rev'd in part*, 494 F.2d 1297, 1301 (10th Cir.

7    1974). Under §§ 951 and 956, the IRS imputed income to the shareholders based on

8    undistributed corporate earnings accumulated prior to subpart F's effective date, with tax being

9    imposed when the earnings were invested in U.S. property. *Whitlock*, 59 T.C. at 492–93, 509–10.

10   In upholding § 951 as a tax on income, the Tenth Circuit relied on *National Grocery*, where the

11   Supreme Court acknowledged Congress can tax shareholders directly on excessive corporate

12   earnings even if no distribution occurs. *Whitlock*, 494 F.2d at 1301 (citing *National Grocery*, 304

13   U.S. 282); *supra* Sec. I.A. In other words, the Supreme Court in *National Grocery* endorsed both

14   the idea of a tax *imposed directly on a shareholder* and *when a corporation retains earnings*, and

15   not just when an "inclusion event" occurs at the shareholder level. *National Grocery*, 304 U.S. at

16   288–89 (citing *Heiner v. Mellon*, 304 U.S. 271 (1938)); *supra* Sec. I.A. Thus, although the

17   liability in *Whitlock* arose when retained earnings were invested in U.S. property (which the

18   Moores argue was an inclusion event), the Tenth Circuit relied on a Supreme Court case that

19   dispensed with the requirement of a shareholder-level inclusion event. Making an investment

20   during the tax year is also not a prerequisite for a subpart F inclusion. *Supra* Sec. I.D.

21   The Tax Court's opinion in *Whitlock* likewise rejected a strict "inclusion event"

22   requirement. The court explained that Congress had previously taxed shareholders directly on

23   accumulated corporate earnings, and that the Supreme Court had repeatedly signaled that

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

13

"taxation of undistributed current corporate income at the stockholder level rather than at the corporate level is within the congressional power." 59 T.C. at 507–09. And despite *Macomber*, the court recognized that in subpart F Congress singled out a particular set of cases—and degrees of corporate control—where it was appropriate to bypass the corporate entity in determining the income tax. *Id.* at 508–09.

The Tax Court also relied on two "analogous" cases—*Eder* and *Rodney*—upholding as constitutional shareholder-level taxes on undistributed earnings of foreign corporations. *Whitlock*, 59 T.C. at 509 (citing *Eder v. Comm'r*, 138 F.2d 27 (2d Cir. 1943) and *Rodney, Inc. v. Hoey*, 53 F. Supp. 604 (S.D.N.Y. 1944)). Neither case presented an "inclusion event" at the shareholder level. In both *Eder* and *Rodney*, undistributed earnings were simply imputed to the shareholder. *Eder*, 138 F.2d at 27–28; *Rodney*, 53 F. Supp. at 607–08. Although neither case cited *Macomber*, both were plainly concerned with the underlying constitutional concerns under *Macomber*: Can income be taxable to a shareholder absent a distribution? And both opinions reached the same conclusion—that undistributed corporate earnings can constitute income under the Sixteenth Amendment. *Eder*, 138 F.2d at 28–29; *Rodney*, 53 F. Supp. at 607–08.

The Tenth Circuit and Tax Court decisions in *Whitlock* strongly support the notion that § 965 affects income under the Sixteenth Amendment. Both rely on cases upholding the attribution of corporate income to shareholders with no "inclusion event" at the shareholder level, and no "inclusion event" at the corporate level beyond the failure to distribute earnings.

### 3. In Garlock, the Second Circuit rejected a similar constitutional challenge to subpart F as "bordering on the frivolous."

Decades after *Eder*, the Second Circuit again made clear that it is constitutional to disregard the corporate form and require a shareholder to include a foreign corporation's profits in income, regardless of whether they were distributed. *Garlock, Inc. v. Comm'r*, 489 F.2d 197,

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

14

202–03 (2d Cir. 1973). The Moores' suggestion that *Garlock* is irrelevant is fruitless. While the shareholder in *Garlock* was taxed when the corporation invested in U.S. property (arguably an "inclusion event"), the Second Circuit's constitutional underpinning for upholding the tax was its *Eder* decision—which had no "inclusion event" as the basis for imposing tax. *Supra* Sec. I.F.1. The court even said that the taxpayer's constitutional challenge to subpart F "border[ed] on the frivolous" in light of *Eder*, which bolsters *Eder*'s continued vitality. *Garlock*, 489 F.2d at 202.

Further, the Moores unsuccessfully downplay how much *Heiner v. Mellon*, 304 U.S. 271 (1938) undermines *Macomber*. The Second Circuit in *Eder* in 1943, and again in *Garlock* thirty years later, looked to the Supreme Court's decision in *Mellon* to determine when undistributed income should be taxed and to whom. In *Eder*, the Second Circuit relied on *Mellon* in ruling that minority shareholders could be taxed on income that could not be distributed under foreign law. *Eder*, 138 F.2d at 28 ("In a variety of circumstances it has been held that the fact that the distribution of income is prevented by operation of law, or by agreement among private parties, is no bar to its taxability.") (paraphrasing *Mellon*, 304 U.S. at 281). This went squarely against *Macomber*'s "inclusion event" requirement. And in *Garlock*, when rejecting a constitutional challenge to subpart F, the Second Circuit plainly stated that "the doctrine of *Eisner v. Macomber* . . . as applied to the facts in this case . . . has no validity under *Mellon*." *Garlock*, 489 F.2d at 203 n.5. The Moores cannot un-ring the Second Circuit's pronouncement that *Macomber* has no place in modern-day tax law, especially with respect to subpart F.

### 4.   The Tax Court has consistently found the subpart F provisions implicated by § 965 to be constitutional.

The Moores ignore the fundamental concepts in *Dougherty*, which upheld a subpart F provision similar to § 965. Opp. at 19-20. In *Dougherty*, the taxpayer claimed § 951 (the general subpart F inclusion) was unconstitutional because it attributed income to shareholders for a tax

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

period in which the corporation did not have earnings and profits, which they argued meant there was no income under the Sixteenth Amendment. *Dougherty v. Comm'r*, 60 T.C. 917, 928 (1973). The income attribution to the shareholder occurred when the CFC had an investment in U.S. property under § 956.[6] *Id.* at 930. While the Tax Court called this a "taxable event," it conceded this was not the same kind of "event" *Macomber* envisioned, as "there ha[d] been no separation of corporate assets." *Id.* Nothing was distributed to the shareholders as would be required under *Macomber*. Nor was there an "income event" at the corporate level, as the CFC had no current-year earnings. The court carefully side-stepped *Macomber*, stating that *Macomber* should not prevent Congress from exercising its broad plenary power to tax with respect to CFCs. *Id.* at 929–30. Relying on its earlier decisions in *Whitlock* and *Garlock*, the Tax Court rejected the taxpayers' Sixteenth Amendment challenge to § 951. *Id.* at 927–29 (citing *Whitlock*, 59 T.C. at 505–10 and *Garlock, Inc. v. Comm'r*, 58 T.C. 423, 438 (1972)).

## II.   Section 965 is not retroactive, despite the Moores' attempts to make it so.

### A.   The Moores adopt an overly broad definition of retroactivity.

The Moores contend § 965 is retroactive because it makes taxpayers "worse off than they would have been without the enactment of the statute" and implicates "prior conduct." Opp. at 23. This is a faulty, overly simplistic standard. Any change in law potentially makes people "worse off" and affects "prior conduct." People make decisions and enter into contracts based on the current state of the law. But if the law then changes, such that their decision or their contract is no longer as favorable as expected, that, alone, does not make the new law retroactive. MTD at 24-28 (citing cases). This same rationale applies to § 965.

---

[6] As previously explained, a § 956 inclusion only requires that the CFC hold an interest in U.S. property—which can be previously acquired property. *Supra* Sec. I.D.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

16

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

Section 965 arguably makes the Moores "worse off" in that they can no longer defer tax on their share of KisanKraft's income, a benefit of the previous tax system that they took advantage of and claim to have relied on. Complaint, ¶¶ 11, 19-20; Opp. at 10-11, 23-24. However, Congress was entitled to end the tax deferral at any time. *United States v. Carlton*, 512 U.S. 26, 33 (1994) ("Tax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code."); *Welch v. Henry*, 305 U.S. 134, 146–47 (1938) (no citizen enjoys immunity from changes in tax law); *see also New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934) (deductions are a matter of "legislative grace"). The Moores, on the other hand, argue that they have the right to enjoy an indefinite tax deferral, or perhaps ultimately, no tax at all. *See* Opp. at 23-24 (claiming that "the Moores received no income subject to U.S. tax").

Applying the correct retroactivity standard—*i.e.*, whether a law "attaches *new legal consequences* to events completed before its enactment"—shows that § 965 is not retroactive. *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994) (emphasis added). The Moores inaccurately describe § 965 as making them "subject to a tax liability that they otherwise would not have borne." Opp. at 24. The Moores are subject to income taxes on their share of KisanKraft's earnings with or without the TCJA. The only question is when. Active[7] CFC earnings were taxable under pre-TCJA law; the tax was merely deferred until the earnings were distributed to shareholders or otherwise repatriated. MTD at 6-7, 22, 25-26. As the Moores note, many CFCs chose to reinvest active earnings, resulting in tax deferral for their shareholders. Opp. at 23-24. Under the TCJA, those same CFC earnings are still taxable, except the tax is no longer deferred. MTD at 7-8, 27-30. Instead, the CFC earnings are deemed repatriated and

---

[7] The phrase "active CFC earnings," as used here, is shorthand for non-movable CFC earnings that were subject to tax, but not taxed currently (*i.e.*, were tax deferred) under the pre-TCJA system. MTD at 5-6.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

17

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1   included in current income under § 965. *Id.* at 7-8. Thus, § 965 does not impose new legal

2   consequences on the Moores for past events. It eliminates a tax-deferral benefit for income that

3   was already subject to tax in the first place.

4        Even if the Moores' overbroad standard applied, they are not clearly "worse off" under

5   § 965. *See* Opp. at 23-24. Due to a deduction under § 965(c), the income inclusion resulting from

6   § 965 is generally subject to tax at lower rates than it otherwise would have been. MTD at 8

7   (describing deduction meant to achieve 8% and 15.5% equivalent rates). Taxpayers also get a

8   favorable election under § 965(h) that lets them pay any resulting liability over eight years. *Id.* at

9   8-9. Section 965 could actually have created a net tax benefit for the Moores, depending on when

10  they otherwise would have included their share of KisanKraft's earnings in income, what tax

11  bracket they would have been in, what deductions or credits they could have claimed, whether

12  they would have any offsetting losses, and a whole host of other unknown variables. The

13  ambiguous impact of § 965 on the Moores at this stage—where it would be speculative whether

14  they would have owed more or less tax on their share of KisanKraft's earnings without § 965—

15  underscores that the "worse off" inquiry is untenable, especially on a cross-motion for summary

16  judgment. The Moores cannot prove that no genuine dispute of material fact exists as to whether

17  they are "worse off" under § 965.

18       The court should reject the Moores' "worse off" standard as a blunt instrument, unsuited

19  to the nuanced analysis required here. A case-by-case approach and critical thinking are needed

20  to truly assess whether a statute is retroactive. As the Supreme Court stated in *Landgraf*, courts

21  must engage in "a process of judgment concerning the nature and extent of the change in the law

22  and the degree of connection between the operation of the new rule and a relevant past event."

23  511 U.S. at 270. "Any test of retroactivity will leave room for disagreement in hard cases, and is

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

18

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

unlikely to classify the enormous variety of legal changes with perfect philosophical clarity." *Id.*

Under the Ninth Circuit's framework, based on *Landgraf*, courts look first to the statutory text,

then to the statute's effect, to determine whether it is retroactive. MTD at 19-20. As discussed in

the Motion to Dismiss, and clarified below, § 965 is prospective. *Id.* at 20-28.

### B.  The Moores misconstrue the plain language of § 965.

Section 965 was amended in 2017 and provides for an income inclusion in "the last

taxable year of a deferred foreign income corporation which begins before January 1, 2018." 26

U.S.C. § 965(a). This results in an increase, in 2017 or 2018 (generally speaking), in the subpart

F inclusion for U.S. shareholders of certain CFCs[8] that are deferred foreign income corporations.

MTD at 21. By its terms, § 965 is not retroactive.[9] *Id.* at 20-21.

The Moores' comparison to the *GPX* case is inapt. *See* Opp. at 23. *GPX* involved a 2012

statute on countervailing duties that applied to "all proceedings initiated . . . on or after

November 20, 2006." *GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1143 (Fed. Cir.

2015). The statute in *GPX* was thus retroactive on its face.

As analogous cases make clear, § 965 is not facially retroactive just because current

income is measured by reference to past conduct. MTD at 22-26 (citing cases); *infra* Sec. II.C;

*Landgraf*, 511 U.S. at 269 (statute does not operate retroactively "merely because it is applied in

a case arising from conduct antedating the statute's enactment"). The Moores point out that

§ 965 income is premised on "earnings and profits . . . accumulated in taxable years beginning

after December 31, 1986." 26 U.S.C. § 965(d)(3); Opp. at 24. But this language does not make

---

[8] The § 965 inclusion applies to "specified foreign corporations," which includes CFCs. 26 U.S.C. § 965(e); MTD at 7-8 & n.7. As KisanKraft is a CFC, only CFCs are relevant here.

[9] As previously addressed, § 965 has, at most, less than one year of retroactivity: it was enacted in December 2017 and effective for the whole of 2017. This type of brief retroactivity is commonly accepted in tax laws, and the Moores do not contest § 965 on this ground. MTD at 21; *Infra* Sec. III.D.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

19

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

§ 965 retroactive. The definition of dividends in the tax code is based on corporate "earnings and profits accumulated after February 28, 1913." 26 U.S.C. § 316(a)(1). Yet no one argues that taxing dividend income is retroactive or reaches back over 100 years.

The Moores' real dispute lies in their misguided belief that an "inclusion event" is needed for income to be taxed, but that is a separate issue from retroactivity. *See* Opp. at 14-16; *supra* Secs. I.D-I.F. The pool of earnings and profits that § 965 addresses was accumulated starting in 1987, MTD at 29, just as the pool of earnings and profits that § 316 addresses in defining a dividend was accumulated starting in 1913. The difference is that dividend income is generally taxed upon distribution, when it is both realized and recognized by the recipient. In contrast, the CFC income addressed by § 965 was granted tax-deferral benefits through 2017: instead of being taxed yearly upon accumulation—or realization—like other subpart F income, it was allowed to accumulate tax-deferred, with distribution serving as a recognition event. MTD at 6-7. Now that Congress has ended the tax deferral, taxpayers like the Moores are recognizing all of their share of accumulated CFC income through a deemed recognition.

But the concept of deemed recognition—or the taxation of undistributed income—is not unique to subpart F and is used in many parts of the tax code. *Supra* Secs. I.A-I.B, I.E; MTD at 12-16. In equating a deemed recognition of earnings with a "retroactive" tax on those earnings, the Moores conflate retroactivity with their "inclusion event" argument, and improperly seek to have subpart F income taxed the same way as dividends. *See Rodriguez v. Comm'r*, 722 F.3d 306, 309–11 (5th Cir. 2013) (subpart F inclusions are not dividends; subpart F inclusions "involve no distribution or change in ownership," whereas dividends require both); *accord SIH Partners LLLP v. Comm'r*, 923 F.3d 296, 307–08 (3d Cir. 2019); Opp. at 24.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

20

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

The Moores call the United States' defense "sophistry," but they once again present an oversimplified analogy: a 30-year retroactive tax that goes back in time and changes the tax rates. Opp. at 24. Section 965 does not change the applicable tax rates in the past, or punish anyone for prior tax deferral of CFC earnings. MTD at 22, 27-28. The reason the Moores feel "Congress pulled the rug out from under them," Opp. at 30, is that Congress, in implementing § 965, ended a tax deferral they had enjoyed previously, resulting in an unexpected tax bill. But Congress did not subject them to a *new* tax liability. Section 965 only changed the year in which taxpayers like the Moores recognize income by ending a previously advantageous tax deferral.

It bears mention that the Moores enjoyed over a decade of tax deferral on their share of KisanKraft's earnings. Opp. at 10-11; C. Moore Decl., ¶ 9 (Moores invested in 2006). Now that the favorable treatment has come to an end, they accuse the government of "retroactivity" because it did not grant an indefinite tax deferral. If KisanKraft's earnings had never been tax deferred in the first place, Congress would not have needed § 965. *See* MTD at 7.

In sum, § 965 is prospective on its face. The Moores ignore similar language used in other parts of the tax code and conflate tax-deferred income with tax-free income.

### C.  The Moores fail to distinguish adverse case law.

The Moores summarily dispense with several lines of case law showing that § 965 has no retroactive effect. Opp. at 24-25. This is telling.

First, the Moores misread *Dougherty*. The Tax Court held in *Dougherty* that a subpart F provision, § 951(a)(1)(B), was not retroactive even though it effectively imposed a tax on earnings accumulated before subpart F's enactment.[10] *Dougherty v. Comm'r*, 60 T.C. 917, 928–

---

[10] To clarify what was stated in the Motion to Dismiss, MTD at 23: *Dougherty* addressed a constitutional challenge to § 951(a)(1)(B), which involves investment of earnings in U.S. property as determined under § 956. 60 T.C. at 927.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1    30 (1973); MTD at 23. Contrary to the Moores' description, Opp. at 24, *Dougherty* dealt

2    explicitly with "the assertion that the application of [§] 951(a)(1)(B) involves a retroactive

3    taxation of income" and held that the law was not retroactive. 60 T.C. at 929.

4        Indeed, *Dougherty* presented a stronger case for retroactivity than the Moores do with

5    § 965. In *Dougherty*, then-new subpart F resulted in income tax on earnings that taxpayers had

6    not expected would be taxable prior to subpart F. 60 T.C. at 928–29. Section 965, however,

7    targets income that CFC shareholders had known was taxable for decades. *Supra* Sec. II.A; *infra*

8    Sec. III.A. The fact that an arguably "new" tax in *Dougherty* was not considered retroactive

9    means that § 965, which in no way imposes a new tax, cannot be retroactive.

10        Second, the Moores' analysis of the "prior earnings" and "prior contract" cases, *see* MTD

11   at 23-26 (discussing cases), admits that their real issue is with § 965 counting undistributed

12   income, not any purported retroactivity. The Moores state that the dividends in *Lynch v. Hornby*,

13   247 U.S. 339 (1918), and *Peabody v. Eisner*, 247 U.S. 347 (1918), were taxable because they

14   were received by shareholders. Opp. at 25. This repeats their "direct tax" argument that income

15   can only be taxed upon distribution. Taxing undistributed income has repeatedly been upheld as

16   constitutional in a century's worth of case law since *Eisner v. Macomber*, 252 U.S. 189 (1920),

17   the principal case on which the Moores rely. *Supra* Secs. I.A, I.E-I.F; MTD at 12-16.

18        Third, the Moores adopt a facile view of when a law is "premised on past conduct." They

19   argue that the United States' cited cases, MTD at 23-26, are not based on past conduct, "but

20   rather taxes on payments made after the effective date of the tax statutes." Opp. at 24-25. But the

21   dividends in *Lynch v. Hornby*, 247 U.S. at 343–44, and *Peabody v. Eisner*, 247 U.S. at 348–50,

22   were derived from earnings accumulated before the income tax became legal. MTD at 24. Thus,

23   they were premised on the past decision to retain earnings, which perhaps would not have

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

22

accumulated to the same extent had corporate officers known they would become taxable. *Id.*
The "prior contract" cases like *Polone v. Commissioner*, 505 F.3d 966, 971–73 (9th Cir. 2007),
involve taxes based on agreements taxpayers had made before a change in law. MTD at 24-26
(discussing *Polone* and other cases). Even if payments under those agreements came after the
change in law, they were premised on past conduct: contracts that people might not have entered
into had they known Congress would modify the tax treatment of future payments. *Id.*

     Similarly, the Moores might wish they had a chance to change their behavior had they
known § 965 would end tax deferral on their share of KisanKraft's earnings. Perhaps they would
have divested their shares, or lobbied other shareholders to distribute earnings sooner. But a
change in law is not retroactive simply because it impacts choices taxpayers made based on an
earlier state of the law. Otherwise taxpayers would have the right to "ossify" existing law any
time they make a decision. *Landgraf*, 511 U.S. at 269 n.24. Taxpayers also accept the risk that
the law might change when opting to defer tax. MTD at 24-26.

     Finally, the Moores fail to address the "frustrated expectations" cases. MTD at 26-28
(citing *Chem. Waste Mgmt., Inc. v. EPA*, 869 F.2d 1526 (D.C. Cir. 1989), *Am. Min. Cong. v.
EPA*, 965 F.2d 759 (9th Cir. 1992), and others). Those cases show that a new law is not
retroactive merely because it targets ongoing behavior that began years earlier, or because it
upsets expectations based on prior law. *Id.* Section 965 ends tax deferral of active CFC earnings
accumulated prior to December 31, 2017, which had begun years earlier under prior law. *Id.*

     The Moores relegate to inconvenient afterthoughts all of the cases illustrating that § 965
has no retroactive effect. Far from Congress acting retroactively, it is the Moores that wish to
turn back time and change their behavior to avoid a law they dislike. But the courts have spoken:
taxpayers are not entitled to advance warning of every change in the law.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

23

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

Because § 965 is not retroactive, the court should grant the United States' motion to

dismiss and deny the Moores' cross-motion for summary judgment.

**III.     Section 965 passes the *Carlton* test.**

Under the Supreme Court's *Carlton* standard, § 965 is constitutional even if the court

finds it retroactive (which it is not). MTD at 28-33; *United States v. Carlton*, 512 U.S. 26, 30–31

(1994). Section 965 serves the legitimate legislative purpose of preventing a windfall that would

otherwise turn billions of dollars of taxable income into tax-free income. MTD at 29-33. This is

accomplished rationally by having taxpayers recognize previously tax-deferred income in the

first applicable year, the year of enactment of the TCJA or a subsequent year. *Id.* at 7-8, 29-30.

The Moores confuse the concept of tax-deferred income, which is still taxable, with that of non-

taxable income, which is never subject to tax in the first place. By missing this key distinction,

they mislabel § 965 a "wholly new tax" and invoke outdated cases from the Lochner Era.

**A.  The Moores rely on century-old cases that are inapplicable.**

***1.   Section 965 is not a "wholly new tax."***

The 1920s cases that the Moores cite are all distinguishable as relating to brand new

taxes. *See Untermyer v. Anderson*, 276 U.S. 440, 444–46 (1928) (nation's first gift tax); *Blodgett

v. Holden*, 275 U.S. 142, 147 (1927) (same); *Nichols v. Coolidge*, 274 U.S. 531, 533–34, 534

n.1, 542–43 (1927) (novel development in estate tax); Opp. at 25-27. *Nichols* is also inapplicable

because the property transfer at issue was not made "in contemplation of death," and should not

have counted toward the decedent's gross estate for estate tax purposes. 274 U.S. at 540–42.

As discussed, the tax on CFC earnings—and the subpart F framework under which § 965

was enacted—is not new. *Supra* Sec. II.A; MTD at 5-8, 29-31. It has existed since 1962. The

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1   CFC earnings at issue were always taxable, both under prior law and current law. The timing of

2   the income recognition (and relatedly, the tax payment) is what changed with § 965.

3          Subpart F itself, including § 965, also does not directly impose a tax. It defines various

4   income inclusions that are then combined with other income and subject to income tax under § 1

5   (individual income tax rates) or § 11 (corporate income tax rates). MTD at 5-8. The income tax

6   has existed since 1913. Thus, § 965 is neither "wholly new" nor a "tax."

7          The Moores wrongly portray § 965 as a "wholly new tax" so they can resort to outdated

8   cases like *Untermyer*. Opp. at 27. Again, § 965 did not make income taxable where it had not

9   been before: it eliminated tax deferral for active CFC earnings. While the practical impact of

10  deferral may have felt like paying no tax, it was not the same as never paying tax. *Supra* Sec.

11  II.A; MTD at 5-8, 29-31. Under the Moores' reasoning, deferred interest on, say, student loans,

12  would give students the right to claim after graduation that they never owed any interest at all.

13  They neglect the time value of money and pretend that debts not presently due are never due.

14  MTD at 30 (absurd outcome of Moores' logic). Their reliance on *Cooper* and *NetJets* is premised

15  on the same faulty belief that § 965 is a "new tax," and thus, is unfounded. Opp. at 26-27 (citing

16  *Cooper v. United States*, 280 U.S. 409, 412 (1930), and *NetJets Aviation, Inc. v. Guillory*, 207

17  Cal. App. 4th 26, 57 (2012)); *infra* Sec. III.B (further distinguishing *Cooper* and *NetJets*).

18         The one-time nature of § 965's income inclusion also does not make it a "new standalone

19  tax." *See* Opp. at 27-28. It is a transitional provision meant to bridge the pre-TCJA treatment of

20  active CFC earnings with the post-TCJA treatment of those same earnings. MTD at 5-8, 29-31.

21  While some taxpayers, like the Moores, dislike the TCJA's abrupt end of tax deferral, § 965 did

22  not reclassify previously untaxable income as taxable. *Id.*; *supra* Sec. II.A. To the contrary, it

23  ensured that previously *taxable* income remained taxable and would be subject to tax.

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

25

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1  The Moores cite a committee report, a senator's floor remarks, and two White House

2  publications in arguing that "Congress itself regarded" § 965 as a "one-time" tax or "windfall."

3  Opp. at 27-28, 28 n.17. This legislative history lacks force of law. *Nw. Envtl. Def. Ctr. v.*

4  *Bonneville Power Admin.*, 477 F.3d 668, 683 (9th Cir. 2007) (citing *Shannon v. United States*,

5  512 U.S. 573, 584 (1994)). Committee report language has "no binding legal effect," and treating

6  it as binding "undermines our constitutional structure of separated powers." *Id.* at 684. Likewise,

7  press releases and a lone senator's statements have no binding effect. *E.g.*, *Georgia v.*

8  *Public.Resource.Org, Inc.*, ____ S. Ct. ____, 2020 WL 1978707, at *10 (Apr. 27, 2020); *United*

9  *States v. Snell*, 592 F.2d 1083, 1087–88 (9th Cir. 1979).

10  Further, just because § 965 is commonly referred to as a "one-time tax" does not make it

11  a "new tax" for purposes of constitutional analysis. When the Supreme Court examined the

12  constitutionality of the Affordable Care Act, it upheld the individual health-insurance mandate as

13  a tax, not a penalty, even though it was widely called a "penalty" and was labeled as such in the

14  statute. *NFIB v. Sebelius*, 567 U.S. 519, 563–74 (2012). The "one-time" and "windfall" language

15  cited by the Moores is not even found in § 965. *See* 26 U.S.C. § 965. Precisely speaking, § 965 is

16  a transitional income inclusion, not a tax. "One-time tax" is a convenient shorthand for those not

17  steeped in the intricacies of the tax code. Under *Sebelius*, the court must look beyond the

18  informal labels used in legislative history or other publications when determining whether § 965

19  truly imposes a "new tax." It does not for the many reasons stated above.

20  Because § 965 is not a "wholly new tax," *Untermyer*, *Blodgett*, and *Nichols* do not

21  govern its constitutionality.

22

23

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

26

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

### 2. The Supreme Court questions whether the Moores' cited cases are good law.

The Moores claim that Lochner Era cases like *Untermyer*—the origin of the "wholly new tax" standard—have never been explicitly overruled, and thus, are binding here. Opp. at 26-27, 27 n.16. While those cases remain on the books, the Moores ignore that the Supreme Court itself has doubted whether *Untermyer* and its siblings survive. *Carlton*, 512 U.S. at 34 ("To the extent that their authority survives, they do not control here."). In *Carlton*, the Supreme Court heavily distanced itself from the *Untermyer* line of cases as representing "an approach that has long since been discarded," and cabined it as applying narrowly, at best, to "wholly new taxes." *Id. Hemme*, an earlier Supreme Court case the Moores cite, Opp. at 26, actually emphasizes the "limited value" of the *Untermyer* cases, and reverses a district court opinion relying on *Untermyer* and an "absence of notice" objection. *United States v. Hemme*, 476 U.S. 558, 567–68 (1986). Plus, under *Carlton*, lack of notice is not dispositive. *Carlton*, 512 U.S. at 33; MTD at 30.

There is no reason to bypass the *Carlton* test and substitute the obsolete *Untermyer* (or *Blodgett* or *Nichols*) standard that the Supreme Court has all but expressly repudiated. 512 U.S. at 30–31, 34. Perhaps because the Moores find *Carlton* unfavorable, they brush it aside and ask the court to replace it with their own, handpicked test plucked from the musty annals of 1920s Supreme Court law.

### B. There is no bright-line limit on retroactivity under *Carlton*.

In attempting to invoke the *Untermyer* standard over the predominant *Carlton* test, the Moores introduce a bright-line rule that does not exist under *Carlton*. Opp. at 26-27, 29. While *Carlton* noted that tax statutes often have a "modest period of retroactivity" of around one year, the Supreme Court did not set forth a rigid limit. 512 U.S. at 32–33. Justice O'Connor's concurrence advocating a firm limit (cited in Opp. at 26-27, 29) did not represent the majority

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1   view. *Id.* at 38 (O'Connor, J., concurring). And statutes with five or more years of retroactivity

2   have been upheld. *E.g.*, *GPX*, 780 F.3d at 1143 (5.5 years retroactive; citing Supreme Court

3   cases involving 6-7 years of retroactivity); *United States v. Perry*, 431 F.2d 1020, 1023–24 (9th

4   Cir. 1970) (indefinite retroactivity); *Battaglia v. Gen. Motors Corp.*, 169 F.2d 254, 259–61 (2d

5   Cir. 1948) (9 years retroactive); MTD at 31-32 (additional cases). Therefore, the "one year"

6   language in *Carlton* nowhere approaches a strict rule.

7        Moreover, in *Harvard Industries*, the court held that a 2004 amendment to 26 U.S.C.

8   § 1502, which allowed the IRS to prescribe different rules for consolidated returns, applied to

9   issues affecting the 1985 and 1995 tax years. *In re Harvard Indus., Inc.*, 352 B.R. 613, 620–21

10  (Bankr. D.N.J. 2006), *aff'd in part, rev'd in part (on other grounds) sub nom. Harvard Secured*

11  *Creditors Liquidation Tr. v. IRS*, 2007 WL 1651144 (D.N.J. June 4, 2007). Although that case

12  did not involve a constitutional challenge, the court nonetheless endorsed an indefinitely

13  retroactive provision. *Id.* at 620 (noting that statutory amendment "shall apply to taxable years

14  beginning before, on, or after the date of the enactment of this Act").

15       The Moores' citations to *Cooper* and *NetJets* are unavailing. While *Cooper* does state

16  that Congress may lawfully "require that taxable income should include profits from transactions

17  consummated within the year," it does not impose a bright-line rule of one year. *See Cooper v.*

18  *United States*, 280 U.S. 409, 412 (1930). To the extent it does, many subsequent cases have

19  allowed greater than one year of retroactivity in tax statutes (noted above).

20       *NetJets* is a California state case that has limited persuasive value compared to the federal

21  case law cited by the United States. *See NetJets Aviation, Inc. v. Guillory*, 207 Cal. App. 4th 26,

22  32 (2012); MTD at 31-32. In addition, *NetJets* is distinguishable as involving a "wholly new

23  tax," whereas § 965 is not "wholly new" or a "tax." 207 Cal. App. 4th at 57–58; *supra* Sec.

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

28

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

III.A.1. *NetJets* also recognizes that the "one year" language in *Carlton*, 512 U.S. at 32–33, is not a set rule, stating: "[W]e do not subscribe to the view that a period longer than one year in and of itself raises serious constitutional questions. Rather, we believe that the modesty of the period must be assessed under the facts and circumstances of the case." *NetJets*, 207 Cal. App. 4th at 58. *NetJets*, in fact, supports the view that modifications to tax law, such as the limitation of benefits, can be applied retroactively for significantly more than one year. *Id.* at 58 (citing cases).

Under the circumstances presented by the TCJA's shift in tax policy, § 965 is constitutional under *Carlton*, even if it involves more than one year of retroactivity. MTD at 29-33; *supra* Sec. III. The Moores' reading of *Carlton* is overly restrictive.

### C. The Moores substitute a non-binding, Federal Circuit standard for the Supreme Court's *Carlton* standard.

The Moores rely on a Federal Circuit variant of the *Carlton* test under *GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1143 (Fed. Cir. 2015), and mistakenly call it a Ninth Circuit standard. *See* Opp. at 29 (referring to "Ninth Circuit" considerations). To the United States' knowledge, no district court in the Ninth Circuit—let alone the Ninth Circuit itself—has ever cited *GPX* or adopted the standard therein.

Federal Circuit law is not binding on this court. Thus *GPX* has, at most, persuasive value. *GPX* outlines "five considerations" that the Federal Circuit believes are "relevant to the rational basis analysis . . . under the Due Process Clause." 780 F.3d at 1142. However, the "five considerations" are not a formulation that the Supreme Court itself has articulated or blessed. *GPX* assembled them from a patchwork of different Supreme Court cases. *See id.*

The Motion to Dismiss contains the proper formulation of the Supreme Court's *Carlton* standard: Section 965 is constitutional as long as it has "a legitimate legislative purpose furthered

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

29

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

by rational means." MTD at 28-29 (citing *Carlton*, 512 U.S. at 30–31). The Moores also fail to

note that, even under *GPX*, they bear the burden "to establish that Congress lacked a rational

basis for the retroactive application of the new law." *GPX*, 780 F.3d at 1141. They have not

satisfied that burden. *See* MTD at 28-33; *supra* Secs. III-III.B.

### D.  Section 965 is still constitutional under the Moores' Federal Circuit standard.

Even if the court evaluates § 965 under the non-binding, *GPX* standard, § 965 should be

upheld. The first *GPX* factor is whether § 965 imposes a "wholly new tax." *GPX*, 780 F.3d at

1142. Section 965 is not "wholly new" or a "tax." *Supra* Secs. II.A, III.A.1. Section 965 does not

even extend the income tax: it modifies the law such that the tax on certain CFC earnings is paid

now instead of later. *Id.* At most, it expands the definition of subpart F income, which is on par

with the law upheld in *GPX*. MTD at 8; *GPX*, 780 F.3d at 1142 (law extending countervailing

duties to new group of importers).

The second *GPX* factor is whether § 965 "resolves uncertainty in the law." *GPX*, 780

F.3d at 1142. Section 965 is curative in a broad sense. *Id.* at 1143 (considering whether law is a

"curative measure"). Without it, many CFC earnings that were tax-deferred before the TCJA

could be brought back to the United States tax-free after the TCJA—a result that Congress did

not intend. MTD at 7-8, 29-31, 33; *supra* Sec. III.A. Thus, § 965 "resolves uncertainty" that

would otherwise have been created by the TCJA.

The third *GPX* factor is the length of the period of retroactivity. *GPX*, 780 F.3d at 1142.

Again, § 965 is not retroactive just because it is premised on prior accumulated earnings. MTD at

20-28; *supra* Secs. II.A-II.C. The period of retroactivity for § 965 is, at most, less than one year.

It was enacted in December 22, 2017, and applies to "the last taxable year . . . which begins

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

30

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1   before January 1, 2018." 26 U.S.C. § 965(a); MTD at 21. This is acceptable under both *Carlton*

2   and *GPX*. *Carlton*, 512 U.S. at 32–33; *GPX*, 780 F.3d at 1143.

3          Under the Moores' flawed notion that § 965 "reaches back thirty years," Opp. at 29, the

4   period of retroactivity would seem long. But the court would have to ignore the statutory text and

5   all supporting case law to adopt the Moores' view. MTD at 20-28; *supra* Secs. II.A-II.C. Even

6   so, the court could not automatically invalidate § 965. It would still need to analyze the facts and

7   circumstances under *Carlton*. 512 U.S. at 30–33. And courts have upheld statutes with five, ten,

8   or more years of retroactivity. *Supra* Sec. III.B (citing cases); *Perry*, 431 F.2d at 1023–24 (anti-

9   kickback law with indefinite retroactivity); *Harvard Indus.*, 352 B.R. at 620–21 (tax law with

10  indefinite retroactivity).

11         The fourth *GPX* factor is notice of the potential change in law. *GPX*, 780 F.3d at 1142.

12  Under *Carlton*, however, lack of notice is not sufficient to establish a constitutional violation.

13  512 U.S. at 34. *GPX* even admits that lack of notice and detrimental reliance on prior law "are

14  not dispositive of the due process analysis." 780 F.3d at 1143; *see also Usery v. Turner Elkhorn*

15  *Mining Co.*, 428 U.S. 1, 16 (1976). This factor, accordingly, bears little weight. Even if notice

16  were relevant, § 965 does not "reverse course" to tax previously untaxable income. Opp. at 30.

17  The income tax on active CFC earnings was merely deferred; those earnings would be taxed

18  eventually. All § 965 does is accelerate payment by deeming the income to be recognized

19  currently. *Supra* Sec. III.A. Minority shareholders warrant no special treatment. *Infra* Sec. III.E.

20         The fifth *GPX* factor is whether the provision is "remedial in nature." *GPX*, 780 F.3d at

21  1142. Section 965 is remedial: Far from seeking a "revenue windfall," Opp. at 30, it *prevents* a

22  multibillion-dollar windfall to CFC shareholders who could otherwise repatriate earnings

23  accumulated prior to the TCJA tax-free. MTD at 29-33; *supra* Sec. III.A. Without § 965, many

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

31

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1   taxpayers, including some of the largest multinational corporations in the country, would escape

2   tax on earnings that had been subject to tax before the TCJA. *Id.* The Moores miss the

3   underlying point that income can be taxable even if the tax has not yet been paid due to deferral.

4   *See* Opp. at 30 (playing semantics with "never been taxed" language in MTD). Section 965

5   blocks any "arbitrage" of holding onto pre-TCJA tax-deferred (*i.e.*, taxable) earnings and

6   claiming post-TCJA deductions for those same earnings. *See* 26 U.S.C. § 245A; MTD at 29-30.

7         Accordingly, § 965 is a reasonable and well-measured law, even under *GPX*. It ensures

8   income does not go untaxed through a gap that would otherwise be created by the TCJA's shift

9   to a more territorial tax system. The Moores merely dwell on their frustrated expectations, which

10  provide no basis to overturn § 965. *See Landgraf*, 511 U.S. at 269 n.24; MTD at 24-28.

11        **E.  It is irrelevant that the Moores are minority shareholders.**

12        There is nothing unique or arbitrary about § 965's application to minority shareholders of

13  CFCs: it treats them consistently with the rest of the subpart F framework. *Supra* Sec. I.B. In

14  enacting subpart F, Congress defined CFCs as foreign corporations owned more than 50% by

15  "United States shareholders," who are defined as 10% or greater owners. 26 U.S.C. §§ 951(b)

16  (pre-TCJA), 957(a); *Dougherty*, 60 T.C. at 928 n.13. In other words, Congress chose not to limit

17  the class of affected taxpayers to majority owners of CFCs, provided they owned at least 10%.

18  Section 965 functions as part of the general subpart F income inclusion for 10% or greater

19  owners of CFCs. 26 U.S.C. §§ 951(a)-(b) (pre-TCJA); 26 U.S.C. § 965 (post-TCJA); MTD at 6-

20  8 & nn. 3-4. What the Moores really seek is special treatment for minority shareholders under all

21  of subpart F. *See* Opp. at 21, 31-32. To overturn § 965 under their reasoning, all of subpart F

22  would have to be found unconstitutional as applied to minority shareholders. But no court has

23  ever invalidated subpart F because it applies to (10% or greater) minority owners.

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

32

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1       If the Moores wished to pay tax only if they exercised majority control over KisanKraft,

2   then they should not have agreed to be minority shareholders. Taken to its logical conclusion, the

3   Moores appear to believe that minority shareholders in any entity should not be taxed on

4   undistributed income because they lacked majority control. *See* Opp. at 21. This contradicts the

5   text and intent of subpart F and other parts of the tax code. *E.g.*, *Dougherty*, 60 T.C. at 928, 928

6   n.13; MTD at 14-15 (partnership and S corporation cases); *supra* Sec. I.B.

7       The Moores also assert, incorrectly, that § 965 runs afoul of *Kaestner* because it taxes

8   minority shareholders. *See N.C. Dep't of Revenue v. The Kimberley Rice Kaestner 1992 Family*

9   *Tr.*, 139 S. Ct. 2213, 2221 (2019) (striking down state tax on trust income as applied to resident

10  beneficiaries, who were "uncertain" to ever receive the income); Opp. at 31-32. *Kaestner* is

11  distinguishable on several grounds. First, *Kaestner* did not involve a retroactivity challenge, but

12  rather a challenge to a state tax under the Fourteenth Amendment as insufficiently linked to the

13  state. 139 S. Ct. at 2219–20 (focusing on "minimum connection" between the state and the

14  resident). Second, the routine business uncertainty of whether KisanKraft will make distributions

15  of earnings is a common question for all CFCs, as well as all partnerships and S corporations.

16  That uncertainty does not prevent undistributed income from being subject to tax. *See* MTD at

17  12-15; *supra* Sec. I.B. Third, by virtue of Mr. Moore's ownership interest, the Moores have an

18  absolute right to share in distributions of KisanKraft's earnings and can vote on how earnings are

19  used. If they disagree with the company's use of earnings, they might bring a shareholder

20  derivative action or another action (depending on Indian law). The beneficiary in *Kaestner*, in

21  contrast, had no right to the trust income or assets, with the trustee exercising sole discretion. 139

22  S. Ct. at 2223.

23

24

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

33

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### IV.    Even if the court finds § 965 unconstitutional, the Moores have failed to prove they are entitled to a refund.

In a refund suit, taxpayers bear the burden of "proving the amount [they are] entitled to recover." *United States v. Janis*, 428 U.S. 433, 440 (1976). They must show they actually overpaid their taxes, not just that the tax assessment was erroneous in some respects. *Id.*; *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932). The Moores focus solely on their constitutional challenges to § 965, which even if successful, do not prove they overpaid their 2017 income taxes. *See generally* Opp.; Agrawal Decl. (Dkt. No. 29-2); C. Moore Decl. (Dkt. No. 29-3). The Moores fail to explain the computations behind the $14,729 refund sought, and fail to present any evidence supporting this amount. The Moores thus have no *prima facie* case for a refund. *See* Fed. R. Civ. P. 56(a). In addition, as part of its defense in this case, the United States is entitled to examine the Moores' 2017 returns, to redetermine their 2017 tax liability, and to raise any offsets (*e.g.*, improper deductions or credits, under-assessed liabilities or penalties) that could reduce or eliminate any overpayment. *Lewis*, 284 U.S. at 283; *Cashman v. United States*, 931 F.2d 896 (Table), 1991 WL 67902, at *1–2 (9th Cir. 1991). Given that discovery has not started in this case, the United States cannot fully present evidence on any offsets. *See* Fed. R. Civ. P. 56(d). Concurrently with this response, the United States is filing a motion under Rule 56(d) requesting that, even if the court finds that § 965 is unconstitutional, the United States is entitled to discovery before the court considers whether the Moores are entitled to summary judgment.

### CONCLUSION

For the reasons stated here and in the Motion to Dismiss, the court should dismiss this case under Rule 12(b)(6) and deny the Moores' cross-motion for summary judgment.

U.S. Reply re: Mot. to Dismiss and
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

34

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822

1   Dated: May 11, 2020

2                                                    Respectfully submitted,

3                                                    RICHARD E. ZUCKERMAN
                                                     Principal Deputy Assistant Attorney General
4
                                                     /s/ Kari M. Larson
5                                                    KARI M. LARSON
                                                     Senior Litigation Counsel
6                                                    JENNIFER Y. GOLDEN
                                                     Trial Attorney
7                                                    U.S. Department of Justice, Tax Division
                                                     P.O. Box 683, Ben Franklin Station
8                                                    Washington, D.C. 20044
                                                     Tel: 202-616-3822 (Larson)
9                                                    Tel: 202-307-6547 (Golden)
                                                     Fax: 202-307-0054
10                                                   Kari.M.Larson@usdoj.gov
                                                     Jennifer.Y.Golden@usdoj.gov
11
                                                     *Attorneys for the United States of America*
12

13

14

15

16

17

18

19

20

21

22

23

24
    U.S. Reply re: Mot. to Dismiss and          35        **U.S. DEPARTMENT OF JUSTICE**
    Response to Cross-Mot. for Summ. J.                    Tax Division, Western Region
    (Case No. 2:19-cv-01539-JCC)                           P.O. Box 683
                                                           Washington, D.C. 20044
                                                           Telephone: 202-616-3822

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on May 11, 2020, I served a copy of the foregoing document by

3   filing a copy through the court's CM/ECF system, which will send an electronic copy to:

4   James R. Morrison (jmorrison@bakerlaw.com)
    Baker & Hostetler LLP
5   999 Third Avenue
    Suite 3600
6   Seattle, WA 98104-4040

7   Andrew M. Grossman (agrossman@bakerlaw.com)
    David B. Rivkin, Jr. (drivkin@bakerlaw.com)
8   Jeffrey H. Paravano (jparavano@bakerlaw.com)
    Katherine L. McKnight (kmcknight@bakerlaw.com)
9   Nicholas C. Mowbray (nmowbray@bakerlaw.com)
    Baker & Hostetler LLP
10  Washington Square, Suite 1100
    1050 Connecticut Avenue, N.W.
11  Washington, D.C. 20036-5304

12  Competitive Enterprise Institute
    Sam Kazman (Sam.Kazman@cei.org)
13  Devin Watkins (Devin.Watkins@cei.org)
    1310 L Street NW, 7th Floor
14  Washington, D.C. 20005

15  *Attorneys for Plaintiffs*

16

17

18                                              /s/ Kari M. Larson
                                                KARI M. LARSON
19                                              Senior Litigation Counsel, Tax Division
                                                U.S. Department of Justice

20

21

22

23

24

U.S. Reply re: Mot. to Dismiss and          36
Response to Cross-Mot. for Summ. J.
(Case No. 2:19-cv-01539-JCC)

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-616-3822